## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 13 2020, 10:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tywun Johnson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 13, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2476<br><br>Appeal from the Hendricks<br>Superior Court<br><br>The Honorable Mark A. Smith,<br>Judge<br><br>Trial Court Cause No.<br>32D04-1807-CM-987 |

**Bailey, Judge.**

# Case Summary

[1] Tywun Johnson ("Johnson") appeals his convictions for operating a vehicle while impaired, endangering a person, as a Class A misdemeanor,[1] and driving while suspended, a Class A misdemeanor.[2] Johson raises three issues on appeal, which we restate as the following dispositive issue: whether the State presented sufficient evidence to support his convictions.

[2] We affirm.

# Facts and Procedural History

[3] On July 19, 2018, the State charged Johnson with Count I, operating a vehicle while intoxicated endangering a person, as a Class A misdemeanor, and Count II, driving while suspended, a Class A misdemeanor. On October 8, 2018, the court granted the State's motion to add Count III, operating a vehicle with an ACE of .15 or more, as a Class A misdemeanor.[3] Johnson waived his right to trial by jury, and the court conducted a bench trial on August 27, 2019. At trial, the parties stipulated to the admission of certified test results establishing that, on July 19, 2018, Johnson had an alcohol concentration equivalent ("ACE") of .267, and Johnson's driving record, which established that his license was

---

[1] Ind. Code § 9-30-5-2(a) & (b).

[2] I.C. § 9-24-19-2.

[3] I.C. § 9-30-5-1(b).

suspended on the night of July 18, 2018. The parties stipulated that all elements of Count I and II other than the "operating" element were met. Tr. at 6.

[4] At the bench trial, the following testimony and other evidence was presented: Late at night on July 18, 2018, Wyatt Kintner ("Kintner") was driving his truck down the eastbound right lane on Interstate 74 ("I-74") near the Brownsburg exit for Indiana State Road 267 when he saw dust being kicked up and a car's headlights flashing in different directions on the westbound lanes of I-74. Kintner then saw a car in the westbound lanes of I-74 drive into the median and crash into the guardrail. He slammed on his brakes and saw the crashing vehicle come to a rest with part of it on the median and part of it in the left-hand lane of westbound I-74.

[5] Kintner parked his vehicle at the side of I-74 eastbound, exited, and crossed the median to reach the crash location. At some point during that time, he called 9-1-1. It took Kintner about thirty seconds from the time he parked his vehicle to the time he reached the crash location, and he did not "have [his] eyes on the [crashed] car that entire time. Tr. at 21-22. As he approached the crashed car, he noticed Jairus Baird ("Baird"), who "appeared to be in a stupor," walking around in a circular pattern near the center, dotted line dividing the two westbound lanes. *Id.* at 10. Traffic was still passing on the outer westbound lane. Kintner, fearing for Baird's safety, tried to help Baird away from traffic. Kintner then heard the crashed car's engine begin to rev, and he looked over at the car and "realized there was someone still sitting there behind the wheel" of

the car. *Id*. at 11. The person sitting in the driver's seat was later identified as Johnson.

[6] Kintner then went to the driver's side of the crashed car. At some point, the driver's side door was opened, but Kintner did not recall if he opened it or if someone else opened it. It appeared to Kintner that Johnson was "trying to drive" but the damage to the car was preventing him from doing so. *Id*. at 12. Kintner did not know whether the car was in gear while Johnson was revving the engine or whether Johnson was wearing a seat belt. He did not see any airbags deployed. The car had damage to the front window, but there was no evidence that either Baird or Johnson had any kind of head injury.

[7] Kintner leaned into the driver's side of the car and told Johnson to turn off the engine. Johnson did not respond to Kintner, and Kintner smelled alcohol on Johnson. At that point, Kintner noticed that Baird had followed him to the car. Kintner became concerned that he might upset Johnson and Baird, so he backed away from the crashed car and began to help direct traffic around it to prevent another crash. After he backed away from the car, Kintner became aware of a third individual walking on the shoulder of the median, westbound, away from the crashed car.

[8] While Kintner was attempting to direct traffic, Officer Michael Gillman ("Officer Gillman") of the Brownsburg Police Department ("BPD") arrived. Kintner informed Officer Gillman that the car had crashed and the occupants of the car had "[taken] off running westbound." *Id*. at 37. Officer Gillman then

noticed one individual running westbound, and Officer Gillman pursued in his vehicle. Officer Gillman caught up with Baird and was questioning him when he heard someone rustling in the trees along the embankment. Officer Gillman yelled for the person to come out of the trees, and Johnson eventually did so. Johnson and Baird informed Officer Gillman that a woman had also been in the car with them. Both individuals appeared to Officer Gillman to be intoxicated. Johnson's speech was slurred, he was "incomprehensible for the most part," and Officer Gillman "could not understand what [Johnson] was telling [him]." *Id*. at 42. Johnson and Baird began to argue about who had been driving the car when it crashed, but Officer Gillman could not determine from that conversation which of them had actually been driving.

[9] Meanwhile, Officer Christopher Nelson ("Officer Nelson") of the BPD had arrived at the scene and was questioning Kintner. By that time, no suspects were at the scene and it appeared to Officer Nelson that "everyone had fled the vehicle." *Id*. at 30. Officer Nelson wore a body camera while at the scene which recorded his interactions there. The DVD from that body camera was admitted into evidence, without objection, as State's Exhibit 3 and was played for the trial court. The DVD recorded Officer Nelson's interview of Kintner at the scene. In the DVD, Kintner confirmed that he was "one hundred percent positive" that Johnson was "the driver" and stated that Johnson "couldn't communicate properly" when Kintner had asked him to turn off the car engine. State's Ex. 3 at 6:29. Officer Gillman brought Johnson and Baird back to the scene of the crash, where Kintner identified Johnson as the driver. The BPD

did not investigate further into the identity of the woman who had allegedly also been in the car when it crashed. The State did not present evidence of who owned the crashed car or to whom it was registered.

[10] Following the bench trial, the trial court found Johnson guilty of Counts I and II. In reaching that determination, the trial court specifically found that Johnson operated the vehicle at the time "it left the roadway." Tr. at 55. The court stated: "based upon that level of intoxication I don't find it reasonable that he would have had enough judgment, control over his faculties to be able to decide in that moment I need [leave the passenger seat] to move this vehicle because it's a necessity, it's an emergency and that just doesn't make logical common sense to me." *Id*. The court also found Johnson guilty of Count III but vacated that conviction on double jeopardy grounds. The court sentenced Johnson to identical sentences of 365 days incarceration with 363 days suspended for each count and ordered the sentences to run concurrently. This appeal ensued.

# Discussion and Decision

[11] Johnson challenges the sufficiency of the evidence to support his convictions. Specifically, he contends that the evidence did not prove that he was driving the vehicle when it crashed; rather, he contends the evidence showed that he could have moved out of one of the passenger seats and into the driver's seat in order to move the car when he realized it was in the way of on-coming traffic after it crashed.

[12]    Our standard of review of the sufficiency of the evidence is well-settled.

> When an appellate court reviews the sufficiency of the evidence
> needed to support a criminal conviction, it neither reweighs
> evidence nor judges the credibility of witnesses. *Bailey v. State*,
> 907 N.E.2d 1003, 1005 (Ind. 2009). The appellate court only
> considers "the evidence supporting the judgment and any
> reasonable inferences that can be drawn from such evidence." *Id*.
> (quoting *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008)). A
> conviction will be affirmed if there is substantial evidence of
> probative value supporting each element of the offense such that
> a reasonable trier of fact could have found the defendant guilty
> beyond a reasonable doubt. *Bailey*, 907 N.E.2d at 1005. A
> [determination] of guilt may be based upon an inference if
> reasonably drawn from the evidence. *See Drane v. State*, 867
> N.E.2d 144, 147 (Ind. 2007).

*Tin Thang v. State*, 10 N.E.3d 1256, 1258 (Ind. 2014).

[13]    Thus, it is not necessary that the evidence

> overcome every reasonable hypothesis of innocence; … *Drane v.*
> *State*, 867 N.E.2d 144 (Ind. 2007). Accordingly, the question on
> appeal is whether the inferences supporting the [judgment] were
> reasonable, not whether other, "more reasonable" inferences
> could have been drawn. *Thompson v. State*, 804 N.E.2d 1146,
> 1150 (Ind. 2004). Because reaching alternative inferences is the
> function of the trier of fact, we may not reverse a conviction
> merely because a different inference might plausibly be drawn
> from the evidence. [*Id*.].

*Jones v. State*, 22 N.E.3d 877, 879 (Ind. Ct. App. 2014).

[14] To support Johnson's convictions of operating a vehicle while impaired, endangering a person, as a Class A misdemeanor, and driving while suspended, the State was required to prove, among other things, that Johnson operated a vehicle. Johnson challenges only the sufficiency of the evidence to prove that he "operated" the vehicle that day. To prove that one "operated" a vehicle, "there must be some direct or circumstantial evidence" to show that the person expended effort to "perform a function … or produce an effect." *Henderson v. State*, 108 N.E.3d 407, 414 (Ind. Ct. App. 2018) (quotation and citation omitted). When determining whether a defendant operated a vehicle, we consider several factors, including:

> (1) the location of the vehicle when it is discovered; (2) whether the car was moving when discovered; (3) any additional evidence indicating that the defendant was observed operating the vehicle before he or she was discovered; and (4) the position of the automatic transmission …. In addition to these four factors, any evidence that leads to a reasonable inference should be considered.

*Crawley v. State*, 920 N.E.2d 808, 812 (Ind. Ct. App. 2010) (quotation and citations omitted), *trans. denied*. However, "the State does not have to prove movement of the car" in order to show the defendant operated it. *Henderson*, 108 N.E.3d at 414. Thus, in *Crawley*, we found that it was "of no moment that nobody observed Crawley operate the motor vehicle" where the State presented sufficient circumstantial evidence from which a reasonable trier of fact could infer beyond a reasonable doubt that Crawley did so. *Id.*; *see also*, *e.g.*, *Wilkinson v. State*, 70 N.E.3d 392, 401-02 (Ind. Ct. App. 2017) (holding circumstantial

evidence was sufficient to prove operation of car even when no one witnessed the defendant driving the car).

[15] Here, there was no testimony from anyone who saw Johnson driving the car. However, Johnson was the only one the witness saw sitting in the driver's seat following the crash. The State presented evidence that Johnson was extremely intoxicated, with an ACE of .267—over three times the legal limit for operation of a vehicle.[4] And both Kintner and Officer Gillman testified that Johnson appeared to be intoxicated and was unable to communicate at the scene of the crash. Given that evidence of Johnson's extreme intoxication, the trial court found it implausible that Johnson would have had the judgment or control over his faculties to decide to move from a passenger's seat to the driver's seat for the purpose of moving the car out of the lane of traffic. That is, the court reasonably inferred from the circumstantial evidence of Johnson's extreme intoxication and his location in the driver's seat following the crash that Johnson was the driver when the vehicle crashed into the median and he simply remained in the driver's seat until Kintner found him there. Johnson's contention that one could also reasonably reach a different inference is a request that we reweigh the evidence, which we cannot do. *Jones*, 22 N.E.3d at 879.[5]

---

[4] I.C. § 9-30-5-1.

[5] Because we conclude that the evidence was sufficient to show that Johnson operated the car at the time it crashed, we need not address whether he operated the car when he attempted to move it out of the lane in which it had stopped or whether he did so out of necessity.

The State presented sufficient evidence to show that Johnson "operated" the vehicle at the time it crashed and therefore committed one count each of the crimes of operating a vehicle while intoxicated endangering a person and driving while suspended, both as Class A misdemeanors.

Affirmed.

Kirsch, J., and Mathias, J., concur.